WALGREEN COMPANY, Plaintiff-Appellee, v. STEPHEN F. SELCKE, Director of the Department of Professional Regulation, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0682

Opinion filed May 26, 1992.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and John A. Morrissey, Assistant Attorney General, of Chicago, of counsel), for appellant.

Burditt & Radaius, Chartered, of Chicago (George M. Burditt and Daniel G. Litchfield, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

The Director of the Illinois Department of Professional Regulation (DPR) placed on probation Walgreen Company's (Walgreen) certificate of registration for violating the Pharmacy Practice Act (Ill. Rev. Stat. 1985, ch. 111, par. 4001 *et seq.*)[1] (Act) and section 330.70 of the Illinois Administrative Code (68 Ill. Adm. Code §330.70 (1985) (transferred to 68 Ill. Adm. Code §1330.70 (Supp. 1988))) (Code), which focus upon the act of "dispensing" and "delivering" prescription medications. On administrative review, the circuit court reversed the decision. DPR appeals, contending that the administrative decision was not against the manifest weight of the evidence and the court's interpretation of conduct constituting the practice of pharmacy was incorrect.

Walgreen was visited by a DPR inspector on February 22, 1987, at its 9503 South Cicero Avenue, Oak Lawn, Illinois, store. At that time, Michael Simko, the pharmacist in charge, was not present; another pharmacist was on duty, Thomas Savage. Other employees then working were Brian Gilmartin, a pharmacy technician, and Christine Chrobak. The inspector determined that although these latter two employees were engaged in pharmacy practice, Gilmartin's license had then expired, and Chrobak was unlicensed.

Following a disciplinary conference on June 26, 1987, the four employees entered into consent agreements with DPR. Simko and Savage agreed that on the date in question Gilmartin and Chrobak were working in the pharmacy area; Gilmartin's expired license had not yet been renewed and Chrobak was unlicensed; Gilmartin assisted Savage and other pharmacists in dispensing medication to the public under the direction of Walgreen's pharmacy; and Gilmartin had applied for renewal of his license prior to the date of inspection, which since has been renewed. Simko added that he was in charge of the pharmacy; he was responsible for all employees as they relate to the practice of pharmacy; and Chrobak since had obtained a pharmacy technician license.

On February 8, 1988, DPR filed an administrative complaint against Walgreen, seeking suspension or revocation of Walgreen's certificate of registration due to Gilmartin's and Chrobak's assistance to pharmacists in "the dispensing of medication to the public," the

---

[1]Now Ill. Rev. Stat. 1989, ch. 111, par. 4121 *et seq.*

former having possessed an expired license and the latter being unlicensed. Walgreen answered, asserted affirmative defenses and motioned to dismiss for failure to state a cause of action. The motion was denied, and a hearing was held on April 8, 1988, before a DPR hearing officer.

Chrobak testified that she began working for Walgreen on August 20, 1986, at 9503 South Cicero Avenue in Oak Lawn, Illinois. When she was hired she rang sales on the register, cleaned shelves and sold vitamins and over-the-counter drugs. At the time of the hearing, she ran the computer and register, cleaned, priced products and "sold warehouse," in the pharmacy area. This area has two windows, one to drop off prescriptions, two computer terminals, an area where pharmacists work and registers near the exit door. She applied for her pharmacy technician license in August 1986, when she began working for Walgreen. She received it in March of 1987. Simko was her supervisor.

On the night of the inspection, Chrobak was ringing sales on the cash register. Gilmartin and Savage were present. Her duties, at that time, were to ring sales on the register, clean and answer the telephone. When someone wanted a refill, she would write the name, prescription number and telephone number on a pad of paper, giving it to a person at the computer terminals, who would put it through. She did not receive new prescriptions, compound prescriptions, package medication in containers, interpret the label directions on prescriptions or advise about medication or recommend it to customers. When she rang up sales of prescriptions, she handed the sealed package to the customer, in the presence of a registered pharmacist. Simko knew she was not yet licensed.

Gilmartin testified he had been employed by Walgreen since October 1985, as a pharmacy technician. He described the pharmacy in substantially the same way as did Chrobak. His duties were to put permanent prescription information into the computers; ring sales on the register; and occasionally pull drugs off the shelf for the "pharmacy" to count. He performed these duties on the day of the inspection. When he received a telephone call, he would put the prescription number into the computer. Simko was his supervisor, but Savage performed that function on the night of the inspection. On that night, he did not have a current pharmacy technician license; it had expired on March 31, 1986. He recalled mentioning this to either Simko or his district supervisor. The expired license was posted on the wall at the store. He had applied for a renewal, but it was lost by the Department in Springfield.

Gilmartin sent in the fee and application for license renewal in January of 1986. Upon inquiry as to nonreceipt of the license, he was informed that the Department was backed up and to "keep going." He inquired again in April, but was informed his application was not received. He never received a renewal form as requested. In December of 1986, he was informed that the Department lost his and other licenses and a new renewal form would be sent, which was sent in February. Gilmartin's regular fee and late fee submitted for this period were returned to him. He received his license renewal in March of 1987.

Savage, a staff pharmacist, testified that on the date in question Gilmartin was a licensed pharmacy technician and Chrobak was cashiering in the pharmacy area. He did not know whether Chrobak was a licensed pharmacy technician. He never saw her take a prescription, package medication in containers, interpret label descriptions on prescriptions, recommend or advise about medication, take an "original prescription, new prescription" from a doctor or take prescriptions or medication from the shelves. He saw her hand a finished prescription in a bag to a customer in the presence of a registered pharmacist. His shift overlapped with hers by only 15 to 20 minutes; he works alone.

The chief pharmacist, Simko, testified that, among other duties, he hired employees but not Gilmartin. A technician takes prescriptions, answers the telephone, rings sales on the register, runs the computer terminal, which enters prescription medication, and occasionally retrieves medication from the shelves. He thought Gilmartin was licensed on the inspection date. Simko knew of the delay in getting Gilmartin's license. He forwarded the renewal application to the pharmacy supervisor and issued a check to pay for the license. Sometime after March 31, 1986, Simko inquired of the supervisor as to why the renewal was not received. He knew the license displayed on the wall had expired.

Simko hired Chrobak as a cashier in the pharmacy. Her duties were to ring sales on the register and hand sealed bags containing prescriptions to customers in the presence of a pharmacist, answer the telephone and clean shelves. She did not fill prescriptions, but may have handled stock on the shelves and put orders in the computer. On the date of the inspection she had no job title. He knew she was not licensed. She never compounded a prescription in his presence, packaged medication in containers, interpreted label directions on prescriptions, recommended or advised customers about medication, or took an original telephone prescription from a doctor.

The DPR Pharmacy Board (Board), in review of the hearing officer's decision, recommended to DPR that Walgreen be found to have allowed persons to engage in the practice of pharmacy when they were not authorized to do so under the Pharmacy Practice Act and, therefore, its license should be put on probation. DPR accepted this recommendation. Walgreen's motion for rehearing was denied.

Walgreen sought administrative review in the circuit court, which directed the Board to answer certain questions intended to determine the exact bases for its findings, specifically, whether it is wrong for an unlicensed person to do the following, in part:

"1. Be a cashier in the pharmacy. [Answered yes, when the cashier hands the finished and packaged prescription to a customer while cashiering.]

2. To receive prescription refill orders by phone, and to transfer such requests to written form. [Answered no.]

3. To ascertain prescription prices. [Answered no.]

4. To clean in and around the pharmacy area. [Answered no.]

5. To hand prescriptions to customers. [Answered as in question 1.]

6. To input prescription information into a pharmacy computer. [Answered yes.]

7. To pull drugs off the shelf (presumably to remove large bottles or packages of drugs off a shelf) for use by the pharmacist. [Answered yes, as part of compounding, packaging and dispensing prescriptions.]

8. To count out pills. [Not involved in this case.]"

After answering, the court declared the Board's responses to be void and remanded the cause for proceedings consistent with "comments of this court from the bench, with the Administrative Procedure Act, with the Administrative Review Act and the Open Meetings Act."

On July 23, 1990, the Board readopted its findings, and DPR accepted the renewed probation recommendation on October 30, 1990. On further administrative review, the circuit court reversed, stating that the record fails to show Gilmartin or Chrobak having practiced pharmacy or having engaged in the practice of pharmacy as that term is defined by the Illinois Supreme Court. DPR appeals, claiming the administrative finding was not against the manifest weight of the evidence and the circuit court's interpretation of the law was incorrect. For reasons which follow, we affirm the circuit court's disposition.

## I

DPR initially asserts the administrative finding that Walgreen violated the Act was not against the manifest weight of the evidence.

■ The administrative record in this case essentially is composed of the uncontradicted testimony of the Walgreen employees involved. DPR decided these undisputed facts supported the conclusion that Chrobak and Gilmartin engaged in the practice of pharmacy. Where, as here, facts are not in dispute, the legal effect to be given them becomes a matter of law reviewable by an appellate tribunal. (*Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 566, 194 N.E.2d 257; *London v. Department of Employment Security* (1988), 177 Ill. App. 3d 276, 279, 532 N.E.2d 294; *Danison v. Paley* (1976), 41 Ill. App. 3d 1033, 1036, 355 N.E.2d 230, *overruled on other grounds by Castaneda v. Illinois Human Rights Comm'n* (1989), 132 Ill. 2d 304, 547 N.E.2d 437.) A reviewing court is not bound by either an agency's or circuit court's conclusions of law. (*Danison*, 41 Ill. App. 3d at 1036.) DPR's contention that some deference be given to the agency's legal conclusions because they involve administrative interpretation of a statute it is charged with enforcing is unsupportable when it is found that the legal conclusions reached are erroneous. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 153, 447 N.E.2d 295 (*Consolidated Telephone*); *Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 174, 528 N.E.2d 737; *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 907, 493 N.E.2d 1130 (*Plainfield School District*).

■ Deference is practiced where fact situations have been dealt with in a line of cases over a long period of time and where courts have reviewed the agency's interpretation of the law, factors absent in the case *sub judice*. See *Consolidated Telephone*, 95 Ill. 2d at 153; *Plainfield School District*, 143 Ill. App. 3d at 911.

## II

Walgreen asserts, and DPR does not dispute, that the present case presents a legal issue of first impression in Illinois and the Act's definition of the practice of pharmacy has never been construed in a situation involving conduct analogous to that of Chrobak and Gilmartin. DPR propounded no legal analysis in concluding that Chrobak and Gilmartin engaged in the practice of pharmacy, either initially or after the circuit court requested answers to its questions.

■ DPR contends that the court read the definition of the practice of pharmacy too narrowly. The statute provides, in part:

"The term 'practice of pharmacy' *** means and includes the compounding, *dispensing*, recommending or advising concerning contents and therapeutic values and uses, offering for sale or selling at retail, drugs, medicines or poisons, whether pursuant to prescriptions or orders of duly licensed physicians, dentists, veterinarians, or other persons authorized to prescribe drugs *** or any other act, service operation or transaction incidental to or forming a part of any of the foregoing acts, *requiring, involving or employing the science or art of any branch of the pharmaceutical profession, study or training*." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 111, par. 4003.

The only Illinois case interpreting the statutory definition at issue here is *Miller v. Department of Registration & Education* (1979), 75 Ill. 2d 76, 387 N.E.2d 300 (*Miller*). There, the Department of Registration and Education, predecessor to the Department of Professional Regulation, revoked three pharmacists' licenses after an administrative determination that certain conduct had constituted "gross immorality" under the Act (*Miller*, 75 Ill. 2d at 78), and constituted a statutory basis for license revocation (*Miller*, 75 Ill. 2d at 81). The conduct there involved the payment of "kickbacks" by the pharmacists to nursing home employees in order to secure sales of pharmaceuticals to those nursing homes or to their patients, a Federal misdemeanor. The three pharmacists pled guilty to the Federal offense. (*Miller*, 75 Ill. 2d at 78-79.) The pharmacists appealed the revocations to the circuit court, and then to the supreme court.

The supreme court in *Miller* examined the definition of the practice of pharmacy contained in the Act and concluded that the Act was designed to assure that only those who had the requisite professional qualifications practiced pharmacy and that the definition of the practice of pharmacy was, therefore, pertinent, stating:

"The term 'practice of the profession of pharmacy,' as defined in the Act, means the compounding, dispensing, recommending or advising concerning contents and therapeutic values and uses, offering for sale or selling at retail, drugs, medicines or poisons, whether pursuant to prescriptions or orders of duly licensed physicians, dentists, veterinarians, or other allied medical practitioners, or in the absence and entirely independent of such prescriptions or orders, or otherwise whatsoever, or any other act, service operation or transaction incidental to or forming a part of any of the foregoing acts, *re-*

*quiring, involving or employing the science or art of any branch of the pharmaceutical profession, study or training."* (Emphasis in original.) (*Miller*, 75 Ill. 2d at 82.) The supreme court then held that "[t]he definition emphasizes the performance of acts requiring professional study and training in the science of pharmacy, rather than the business aspects of the practice of pharmacy." *Miller*, 75 Ill. 2d at 82.

The *Miller* court went on to observe:

"The payment of kickbacks or bribes is not concerned with the exercise of the professional skill of a pharmacist, the focus of the definition of the practice of pharmacy. Such conduct is related to matters extraneous to the central concern of the Pharmacy Practice Act, the protection of public health, safety, and welfare through regulation of the practice of pharmacy. A misdemeanor conviction for the payment of kickbacks or bribes is not 'gross immorality' for purposes of pharmacy-license revocations." *Miller*, 75 Ill. 2d at 83.

The distinction between functions implicating the professional skill of a pharmacist and the business aspects of operating a pharmacy is also evident in *Osco Drug, Inc. v. Department of Registration & Education* (1977), 54 Ill. App. 3d 936, 370 N.E.2d 59, *appeal denied* (1978), 71 Ill. 2d 599. The sole issue there, as here, was the construction of relevant portions of the Act. The Act required that a pharmacy have in charge and present a registered pharmacist "during at least the majority of hours of each day." (*Osco*, 54 Ill. App. 3d at 939.) The Department of Registration and Education maintained that this provision applied to the hours of operation of an entire Jewel/Osco store, rather than the pharmacy's operative hours within the store. (*Osco*, 54 Ill. App. 3d at 938.) In *Osco*, as in *Miller*, the court looked to the entire Act and the purpose for which it was enacted. The *Osco* court analyzed the definition of the practice of pharmacy, and found that the purpose of the Act is to "classify the practice of pharmacy as a technical, specialized profession" (*Osco*, 54 Ill. App. 3d at 941), and held that the relevant hours are those of the pharmacy area and not those of the entire store (*Osco*, 54 Ill. App. 3d at 941). *Osco* thereby was consistent with *Miller* in its separation of the science of pharmacy from the business aspects of pharmacy.

The uncontested facts in the present case reveal that Chrobak and Gilmartin each rang up cash register sales of prescription drug products. They took payment for items sealed in packages and handed the packages to customers designated on the packages. They gave no directions, advice or explanations concerning the products to the cus-

tomers. At all relevant times, a registered pharmacist was present. In addition, Gilmartin entered refill information into the Walgreen computer. Refill information consists of a customer name, phone number and prescription number. Gilmartin also retrieved products off the shelves for the pharmacists.

Ringing up a sale on a cash register is no more a dispensing of pharmaceuticals than a delivery boy taking money from a customer at the latter's home, in payment of the package there transferred. It is not in pursuance of study or training in medicine and drugs, their nature, propensities or traits, but a relatively simple business transaction. Nor does the fact that the cash register is located at or near the pharmacy counter permit the legal conclusion that the salesperson recording the sale is engaged in the practice of pharmacy. It is the straightforward receipt of payment in exchange for a product, under the facts presented here.

Entering refill information by pressing computer keys in order to transcribe the information from a written to an electronic vehicle is no more a practice of pharmacy than allowing an unlicensed employee to write on a pad of paper prescription refill information as received by telephone from a customer; the latter conduct was admitted by DPR to be appropriate under the Act. As the circuit court concluded, this conduct was ministerial, not interpretive.

Nor does merely retrieving a container of a pharmaceutical from the shelf at the request of the pharmacist who is compounding or filling a prescription fall within the exercise of pharmaceutical interpretation, skill or knowledge of medicine or drugs. The pharmacist chooses and describes the desired ingredient, as prescribed by the physician, and determines from his or her own knowledge, training and experience whether what has been brought by his employee correctly corresponds with the product requested by him or her. Surely, simply fetching the product requested cannot place the employee within the practice of pharmacy any more than a law clerk bringing law books from a library at a lawyer's request can be deemed tantamount to the practice of law.

DPR insists that the conduct of Walgreen's employees here rises to a "necessary link in the chain of filling prescriptions and delivering them to the ultimate customer." Yet, it concedes that ringing a sale at a cash register and transferring the product to the customer are appropriate if they occur outside the pharmacy area or at the customer's home. These very acts are as much a "necessary link" at one place as at the other. DPR also admits that the same acts are appropriate when over-the-counter drug products are sold from the phar-

macy area register. Why these acts are not as much a "necessary link" at one register for the sale of prescription drug products as for the sale of over-the-counter drug products from the same register is difficult to reconcile.

Pharmacy Board Rule 330.70 of the Code defines "dispense," one of the words used in the Act's definition of the practice of pharmacy, and "deliver," a word that DPR uses in defining "dispense." "Dispensing" is "delivering," which according to DPR, then becomes the actual transferring of possession of a prescription medication. If so defined, it would have to include the delivery of the product at a register outside the pharmacy area and the delivery of the product by a delivery boy, contrary to DPR's own interpretation.

■■ It should be noted that the case against Walgreen required, in part, that Gilmartin be an unlicensed person. Gilmartin's testimony was that he timely applied for his renewal license, diligently followed up on its status, was told by the Department to continue working and a new application would be forthcoming. He received that application months later, promptly prepared and filed it. Through no fault of his own, he received a written certificate from the agency just before its one-year term expired. He testified that during that entire time, he believed he was licensed. His testimony is uncontroverted. Given the nature of the qualifications for the license—a high school degree, payment of a fee and good moral character—with no examinations or interviews involved (see Ill. Rev. Stat. 1985, ch. 111, pars. 4012, 4035, 4040 (now Ill. Rev. Stat. 1989, ch. 111, pars. 4129, 4132, 4155.2)), it is unremarkable that the agency would advise one person in Gilmartin's situation to "go on" until the lost application was found or the replacement application processed. Gilmartin's testimony is consistent with the fact that DPR did not give him notice of refused renewal for cause. Absent such notice, renewal cannot be withheld. (See Ill. Rev. Stat. 1985, ch. 111, par. 4040 (now Ill. Rev. Stat. 1989, ch. 111, par. 4155.2).) The absence of notice demonstrates that this was a bureaucratic "foul-up." DPR's conclusion that Gilmartin was unlicensed because the Department had failed to issue a renewal certificate that it was legally obligated to issue also was contrary to law.

■ Finally, during the hearing before the Board, the Board's attorney asserted that the consent orders had no bearing on the case against Walgreen. Such an admission having been made, DPR will not now be heard to take an opposite position. See *Murphy v. Rochford* (1977), 55 Ill. App. 3d 695, 700, 371 N.E.2d 260; *Bauer v. Saper* (1971), 133 Ill. App. 2d 760, 762, 272 N.E.2d 703.

The circuit court's conclusion that neither Chrobak nor Gilmartin engaged in the practice of pharmacy, nor did Walgreen allow them to do so, based upon the supreme court's interpretation of the practice of pharmacy in *Miller*, was correct and must be affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.